We have five cases this morning, and I think one of my colleagues would prefer to have this courtroom rather than the courtroom next door at 1 o'clock. So we at least have three and a half hours or so to go, and God knows with this group, we may go a little longer, and I'm part of the problem. The first case this morning is number 19-1842, B.L. v. Mahanoy Area School District. I don't know if I'm pronouncing the school district's name correctly. Mahanoy, Your Honor. Great. Wait a minute. I have a housekeeping matter here that you communicated with opposing counsel in the clerk's office to note that he, that you'd work together on one or two cases unrelated to this one in a different law firm. My associate, Mr. Brown, did. Okay. And you don't think that gives any rise to any particular. Okay. Great. Thank you. Thank you. May it please the court. I'm Mike Levin. I represent the Mahanoy Area School District in this case. With the permission of the court, I'd like to reserve four minutes for rebuttal. That's fine. And if I may tend to one housekeeping item, the Fifth Circuit issued a decision last Monday on November 4, known as Longoria v. San Benito Independent Consolidated School District 2019 Westlaw 5687512. The case was decided on the basis of qualified immunity and the lack of entity liability under Monell. However, there was some discussion of First Amendment concepts that are at play here, including the distinction between being removed from an extracurricular activity as opposed to being suspended from school. I respectfully submit that this case is a close case, and there are good sound arguments on both sides of the issue. Perhaps Justice Thomas best summarized the area of the law in a concurring opinion in Morris v. Frederick, where he said, quote, I'm afraid that our jurisprudence now says that students have a right to speak in school, except when they don't. End of quote. Reading the appellee's brief, I read an assertion that I believe greatly overstates our position. The appellee says, quote, under the school district's reading of Frazier, public school can mete out punishment for a student's speech anytime, anywhere, irrespective of the student's parents' views of appropriate conduct and discipline. End of quote. I want to make it clear that is not our position. It is nowhere near that broad. Instead, the rule that we argue for and that grows out of the facts and circumstances in this case is that school districts can create reasonable rules for eligibility for participation in extracurricular, non-compulsory, voluntary activities, including rules of conduct. The program in this case called for tryouts and agreements to certain reasonable rules of conduct. The lower court summarized the place on a Saturday. Excuse me. Activity took place on a Saturday. Yes. And so it was outside of class, outside of the grounds of the school. And I'm trying to figure out a way. How do how do I get around our in-bank decisions in Leshock and J.S.? Well, there are several ways. And it's critical that the distinctions be made. And we agree that in J.S. and Leshock, if you apply those cases, we lose. But we believe that the distinctions are critical. And the distinctions are laid out in the last several pages of our brief. And there are eight significant decisions. You're going to have to distinguish them because, you know, the last thing a panel can do is overrule an in-bank decision. Correct. Correct. And they are distinguishable and they're distinguishable in these ways. Number one, we're dealing with an extracurricular activity. Those cases did not. Number didn't those cases. I mean, one one dealt with, among other consequences, the inability to attend a dance, inability to attend graduation. Aren't those those places? But they also suspended the students from school. But the on bank didn't distinguish among those. It isn't the issue when it comes to extracurricular activities or any activity. The effect on human speech from the perspective of a reasonable student. And if that's so, why does it matter if it's suspension or expulsion or getting kicked off of a team? Well, the United States Supreme Court in Veronica School District versus Acton clearly noted the distinction between regular school and extracurricular. Pernonia was a Fourth Amendment case about safety and drug use in football and athletics. That does. I don't see as something special about First Amendment rights in an extracurricular context, because that was very clearly tied to the safety of athletes. With respect to the Fourth Amendment. You're right, Your Honor. However, the court made a statement, quote, by choosing to go out on a team, they voluntarily subject themselves to a degree of regulation even higher than that imposed on students generally. In Veronica's public schools, they must submit to a preseason physical exam. They must acquire adequate insurance coverage or sign an insurance waiver, maintain a minimum grade point average, and comply with rules of conduct, dress, training hours, and related matters as may be established for each sport by the head coach and athletic director. Okay. But in those cases, they're representing the school. And also, one of the key concerns that you have with regard to cases that deal with athletics and whatnot, you didn't want high school kids on performance-enhancing drugs. You wanted to be sure that there wasn't a problem there. I agree that that was a critical factor. Sorry, I interrupted you. But the court made it clear that extracurriculars are different, and that's one of the parts of the analysis when they said they voluntarily agreed to the rules. And in this case, the student and the parents signed the rules, and the student agreed that the rules were reasonable. But there's no limiting principle there. Let's imagine the cheerleader team says, our mission is to prepare women to be homemakers so they can support their men. And a cheerleader on Saturday posts a blog post saying, I'm a feminist, and I think women ought to be able to do anything in our society that men do. Can the cheerleading team define its mission and team unity and team spirit in the way you've suggested, and therefore kick her off the team because she expresses a differing point of view? I agree with you that it would not be allowed. But in this case, I believe and I suggest that the rules are extremely and eminently reasonable. Give us a test or a line that's going to work for three cases down the road. The rules in this case, there will be no toleration of negative information regarding cheerleading, cheerleaders, or coaches. This includes foul language and inappropriate gestures. And this foul language and inappropriate gestures was aimed directly at the cheerleading squad in the language that was used in the case. But in J.S. and Leshock, you had the fake profile in J.S. and then the parody that was done in Leshock. Correct. So it's directed at individuals that are among the hierarchy of the school, and what's the difference here? Well, a couple of things. One thing is that in that case, there was no agreement to the rules. In this case, there is. In that case, one could argue the school district had no authority under the legal standards, because Section 510 of the school code outlines the power and authority that exists with respect to suspensions or expulsions from school. 511 of the school code, on the other hand, gives greater authority to school districts with respect to controlling extracurricular activities. But where the First Amendment trumps these, you have not given us a principle. You've just said if you sign this agreement to join the extracurriculars, you signed it away. But then you agreed you can't make someone sign anything away. Is it anything that would have a reasonably foreseeable effect at school, which is a very broad text? How do we keep coaches from just prohibiting anything they don't like? Well, I believe that under the prohibiting anything they don't like, that is a clear violation under the viewpoint concepts of the First Amendment. In a case where you're trying to teach students not to use profanity, not to use profane gestures, not to use foul language, and not to do this in a way that's going to adversely affect the team, those rules are all reasonable, they're all allowed, and under the Supreme Court's analysis in the four different cases that it has decided so far, even Tinker talked about the fact that in that case they weren't dealing with student comportment. The terms of the waivers are much more specific, and they seem to be bounded to things like games, fundraisers, and other events. I'm not sure that I'm following where you're getting that language. That's in the respect rule. It says the rules apply when it deems fundraisers and other events, and it governs foul language insofar as it affects good sportsmanship. How is a student to know when it's outside of those bounds, particularly if a student is speaking on a weekend outside of school, outside of any sporting events, and even outside of the season? The language also says, quote, there will be no toleration of negative information regarding cheerleading, cheerleaders, or coaches placed on the Internet, end of quote. So I think that that's pretty clear that Internet social media isn't going to be tolerated. But even negative information, information connotes facts as opposed to statements of opinion. Well, in this case we're not dealing with opinion. In this case we're dealing with some epithet, some conduct that had no meaning. The cheerleader, the student, could not identify any meaning when asked what the meaning was. She said she was just angry. So we have the argument, which was in our brief, that this is in a form of expression where it conveys no meaning, where it has no expressive content worthy of protection by the First Amendment. The student may have been articulating that message in a way that is perhaps more of that age group, but didn't she then go on to explain that it was her frustration with someone more junior who was getting on the team, and that she, as coming in and having already been on for a year, ought to have been in varsity? She said that that was part of what made her angry, yes. And isn't that a message, in fact a criticism of the policy that's being applied by the team? How is that not an opinion and how is that not a communicative message? Well, you couldn't get it from looking at the word she used or looking at the gesture she made. And she can articulate what it meant or what message she was conveying. And then you get back to the Morse versus Frederick idea where the Supreme Court said that the reasonable interpretations of the conduct by the administrators will be upheld. That was a school-sponsored activity. Correct, but it still gets to the application of the rules. But this conduct took place during the school-sponsored activity. Again, we're talking about something that's off school grounds, not during school hours, with a group of friends, and somebody ends up leaking it. Correct, and I see that my time is up, so I don't know if you want me to answer the question. Thank you. Good morning. May it please the Court, Sarah Rose of the ACLU of Pennsylvania, for Plaintiff Appellee B.L. By and through her parents, Lawrence and Betty Lou Levy. Counsel for Appellant just said that the school district is asking this Court to rule that school districts can create reasonable rules for participation in extracurricular activities, including rules of conduct. We agree, but school districts cannot impose rules on students involved in extracurricular activities that violate their First Amendment rights. And that's what this case is about. It's about the First Amendment rights of students to engage in non-disruptive speech outside of school. The argument they make is that you sign away, or you sign and say that if I'm going to participate in this school activity, that I will abide by a higher code of conduct. And that was violated here. So the question is, what can the administrators do when somebody violates what is perceived to be that higher code of conduct? Well, the school district can't apply a code of conduct to students that violates their First Amendment rights. The district court found that B.L. did not waive her First Amendment rights. Unless it incites violence or something like that. Correct. Well, then it would not be protected by the First Amendment if it was outside of that protection. But B.L. only agreed to the cheerleading rules because she wanted to be a cheerleader. She could not have become a cheerleader without signing those papers. And that's, by definition, coercive. Before I grant, there's some issues about what is consent and what is coercive and extracurriculars. But I at least would like to think about this case by starting with what you started about. Well, this is off campus activity. All right. So let's let's ask what's off campus and what's not in the cyber age. What if she had posted the same image and the same words to a Facebook group for all members of the sophomore class? Would we treat that as on campus or off? How are we going to draw lines here? I think that still has to be treated as off campus speech. And this court's decision in J.S. versus Blue Mountain School District. Judge Chigaris noted that there is no way to make a principal distinction between something that a student posts on the Internet and a remark at an off campus party. What if she sends it to the cheerleading team coaches school emails or to a school listserv? That's it's on the Internet, but it's a school part of the Internet. I think there can be a distinction between sending something directly to the coaches versus sending something that is accessible to other students. I mean, in J.S., the court also noted that it's no surprise that J.S. in that case had directed her her speech toward other students at the school. Those were who her friends were. Right. With a student, that's who their friends are, people who are going to that school with them. You can't automatically assume that they're purposely directing their speech at the school district just because they include their friends. But if the school sets up a computing resource, either it's its own computers or they organize an official page or official listserv. Just because it's on Saturday doesn't mean we can't understand that to be part of the virtual campus, does it? If it is the school district's property, the school district has set it up, then I think that that is more akin to on campus speech. And saying on campus doesn't actually mean it's physically on the school's campus, but it's using school resources. Right. Because Morse versus Frederick, you have the cases where the parade is just off campus, but it's treated as on campus because it's a co-curricular. It's adjacent to it. So it's not physically on the campus. It's not always required. Let's take it up a notch. What if it is clearly off campus speech, but it's in effect what we call today cyber bullying? So I think that the court has to look to... Obviously, it's been left undecided in this circuit as to whether schools can punish students at all for out-of-school speech, even under the Tinker standard. If the speech is so harassing that the school has a compelling interest in punishing the student that's narrowly tailored, then that would take it out of even the student's speech context. And if the school could meet scrutiny, certainly they could punish the student for that speech. But at the very least, schools have to be able to meet the Tinker standard for out-of-school speech. Why in this very case isn't it reasonably foreseeable that sending that kind of message out would have the effect of the freshman in question being bullied? Well, BL didn't mention Mahanoy Area School District. She wasn't wearing any clothes that identified her as a Mahanoy Area School District student. She didn't mention any particular student's names. She didn't even mention cheerleading team. She just mentioned the word cheer, along with the word school, softball, everything, and a profanity. So I think it would be a big leap to imagine that a student would feel bullied as a result of that snap that BL sent out that was available for 24 hours to a limited number of people. But doesn't that point out the reason why, in this age, it's appropriate and reasonable for school districts to have codes of conduct? Because consequences like that, from even off-campus speech, can so easily come back to the school, including safety concerns. Well, so if you're looking at this from the school district's perspective, they're clearly arguing for a standard less than Tinker to apply to out-of-school speech. And the Supreme Court has made it clear, made it clear 50 years ago, that at the very least, schools have to meet Tinker to punish students for in-school speech. So applying a less stringent standard to out-of-school speech would vest school districts with dangerously broad discretion to censor student expression. I understand your position is you win under either test. One of your amici says Tinker shouldn't apply to off-campus speech. What's your first-line position on that? Should it apply or shouldn't, and why? I mean, we would ask this court to rule that Tinker does not apply to off-campus speech, as we did in the JS and Layshaw cases. I mean, obviously, the court does not need to address that question in this case, because the district court ruled that BL speech did not create a material and substantial disruption, nor did it create a foreseeable and specific risk of a substantial material disruption. But the idea that schools can reach outside of their scope of authority and punish students for off-campus speech, I think, gives them dangerously broad discretion over student speech outside of school. And on one hand, you have the school district saying, well, in the internet age, we need this authority. But on the other hand, the Supreme Court in ACLU v. Reno said that the internet is treated the same as the most protective forms of speech. And to limit students' rights on the internet simply because of its broad reach would contravene the principles that the Supreme Court discussed in ACLU v. Reno about how important it is that the fact that you can reach so many more people is not a reason to prohibit the speech. I'd like to go back to your idea of waiver and the inability of a school to impose any kinds of restrictions. I understand that we take special care to ensure there are protections for student speech in the school context. But where have we gone to give even greater protections than adult speech outside of school? You seem to be saying that one can't, as a student, waive your rights to speech or certain kinds of speech as a condition of engaging in certain voluntary activities at school. Why would students be unable to do that when adults outside of school are able to do that? Even in the public employee context, which we are not arguing that the Pickering balancing test applies to student speech, but even in the public employee context, the Supreme Court ruled in Pickering that government employers cannot require government employees to waive all of their first amendment rights as a condition of government employment. There's a public concern and then a balancing test that's applied. That's not the test that's applied to student speech. The Supreme Court has given us the test for student speech. But I think the analogous is appropriate, that you can't, if government employees who have a choice about where they're going to work cannot waive all of their first amendment rights as a result of accepting, cannot be required to waive their first amendment rights as a result of accepting government employment, why would we do the same thing for students? And there's no precedent for that. Our school district is not suggesting that they waive all of their rights. It's imposing certain parameters for participation in an activity that they characterize as a privilege, not a right to begin with. And that the activity may affect things at school, make life more difficult, may lower morale, a host of things. At some point, when can the school step in to regulate conduct that's off campus? Out of school speech. So, you know, we would argue that that can only happen if the government meets strict scrutiny. But that's not this case. We don't need to address that issue in this case. All right. Well, let's take an example from Utah. Cheerleaders, they make the cheerleading squad, keep this confidential for 24 hours. They sign an agreement. And, of course, these girls go on social media and say, hey, we rock. You lose. You didn't make the squad. You can't impose any discipline on them. That agreement is invalid because they lack the power to consent to this modest 24 hour confidentiality. So I think that case is distinguishable in two ways. First, the court did find did apply Tinker and did find that the school district met its burden under Tinker in that case. Second, that's what the school district was asking the cheerleaders to do, was not to divulge confidential information. And that's a very different thing than telling students they can't post any negative information. The consent is not invalid. The consent is valid. You're conceding. It's just a reasonable thing they're consenting to, which is different from saying they can't consent at all. Well, the court still applied Tinker in that case, though. We're saying if you apply Tinker to this case, as the district court did, there was no disruption. The school district cannot meet its burden under Tinker. Ideally, you would have us not apply Tinker. If we don't apply Tinker, can we still uphold that kind of restriction? I mean, it would have to meet strict scrutiny. And I don't think in this case you can meet strict scrutiny. One analogy that I think might be appropriate for the Johnson cheerleading case is, for example, a football player who divulges the plays that they're going to use in the next week's game. I think that is something that the school district could say. You can't divulge information that would be detrimental to the team that is confidential. It's also similar to government employees who have to get preclearance before they can write a book. How about criticizing other members of the team? That standard is too low to meet First Amendment case law. I mean, there's no precedent for allowing the government to punish someone simply because they say something that could be detrimental. A football player criticizes a member of the team and it causes dissension in the locker room. The coaches are going to be very upset and there's going to be discipline. How is this any different? I mean, I think you've got to go again. At the very least, they've got to meet Tinker. To the extent that Tinker doesn't apply to out-of-school speech, then you'd have to be strict scrutiny. And there has to be some breathing room for students to engage in speech. I think one of the problems is what you identified, Judge Bevis, which is that putting these rules in place, it's very difficult to draw those lines. And it's going to end up chilling socially valuable speech of students outside of school. Let's say someone posts something that says, hey, we ought to be able to drink at age 16 and post a picture of himself holding a beer high. Right. Well, there's an advocacy part of that. And the bong hits for Jesus case suggests that that portion of it's protected. But how about the the minor showing himself with alcohol, which is a violation of law in every state? OK, what does a school do threatens to undermine the school's ability to keep a sober environment on campus? We know binge drinking is a problem in a lot of high schools. So I think that's where the school districts point about about schools being able to regulate student athlete speech more than they can regulate or students involved in extracurricular speech more than they can regulate. Just the normal students, students who aren't involved in those activities comes into play because schools can regulate conduct maybe more than they would other students. So, for example, they can say it is illegal for you to possess alcohol. There's a picture of you holding a beer on Facebook for the football students. But you don't think they can do that as to students in general population. Well, as the as a council said, the Pennsylvania school code actually prohibits schools from reaching outside of school to punish students for out of school conduct. What provision? It's cited in there. I think it's section five, 10. What about what about the student who brags about his gun collection on Facebook? He mentions Columbine and Sandy Hook, but he doesn't quite make a true threat. You think that that student, the school lacks the ability to punish that speech? And is that only under Pennsylvania law? Could it could a Delaware or New Jersey school punish that student for activity? It's going to scare some people and creep some people out, but it's not a threat. And that's absolutely a serious concern. And I think at the very least, that would likely meet Tinker. And it could very well meet strict scrutiny if you're looking at the effect of that speech in this day and age on other students at the school, because parents are going to keep their their children home. And the school district has an interest in making sure that kids go to school. But to say that it might meet Tinker is to acknowledge that even if that speech is off campus, that Tinker would apply. What we're saying is that at the very least, Tinker, at the very least, the school district has to meet Tinker. You know, and we think that, you know, a rule saying that Tinker doesn't apply to out of school speech is more appropriate under the First Amendment. And I think that strict scrutiny could actually come in to resolve the concerns that a lot of school districts have, especially when you're talking about violent speech. But in this case, the court does not need to reach that question because the speech did not even meet Tinker here. Do we need to take account of the nature of the extracurricular activity in considering whether a case moves closer to the Frazier, Morse kind of concerns? That is, with some activities, say, student president, folks might look at that person as actually representative of the school and things that are said even off campus as representing the school and the school student body. If there is that sort of identification of the speaker with the school, is regulation then more permissible because of some appearance of endorsement, for example? I think that when the student is acting in their role as a student government leader, then the school has authority under Hazelwood to, you know, censor that student's speech. But when the student is acting on their own, they're not in school, they're not acting as a member of the student government, then the school's authority is limited under the First Amendment and they cannot reach that speech and censor it. Isn't that true of all athletes, including on the cheerleading team, that they're viewed as leaders in the student body and representative of the school even off campus? I don't think that that showing's been made in this case. I don't think there's any evidence going to that perception that student athletes are considered to be school representatives. I mean, students are the customers of a school. They are not the school's representatives. And I don't think it's reasonable for a person to view a student athlete as a representative of the school when they're on the weekend, out of school, on their own time, at the cocoa hut. That is not a reasonable thing for a reasonable inference for people to draw. And it would also have really serious consequences on students' right to engage in socially valuable speech outside of school. Look at students who want to report hazing in the locker room, students who report discrimination or even sexual harassment by coaches. You look at the negative information rule in this case, and that could be used to prohibit a member of the debate team from criticizing the lack of diversity on the team or the student newspaper editor from criticizing a censored article on Facebook. There are so many different ramifications that could occur that would be very dangerous in terms of students' free speech rights outside of school. I think that's a good segue to Mr. Levin on rebuttal. Thank you. Thank you. Just a few short comments. Do you want to pick up where Ms. Rose left off? I wasn't paying attention. One of the issues that the judges asked was the distinction between in school and out of school in this day and age. And the court is well aware that a lot of courts have struggled with that as reflected in their decisions. But there's an interesting word or phrase that was used by the Supreme Court in Frederick versus Morris, where the court was talking about the conduct in the Frazier case. And the court basically said, in school, Frazier's conduct was not protected by the school, by the First Amendment. But when saying if he made the statement outside, they didn't say out of school. They said outside the, quote, school context, end of quote. And I suggest that the Supreme Court very carefully chose that word, perhaps to avoid the problems of what's in school and what's out of school. And this post was definitely related to the school context. It was sent to other school students, including members of the cheerleading squad, and it referred solely and directly to school. Another brief comment is obviously Cohen versus California, a very important case. And the comments about Tinker's armband is allowed in school, but not Cohen's jacket. One of the facts in that case that the Supreme Court dealt with as to why it was protected when he was wearing that jacket in the courthouse, is they said it did not include any personal insult, end of quote. In this case, it's fair and reasonable to interpret Beale's comments as including personal insult. Counsel argued that only a limited number of people saw this. It was sent to 250 people. And my final comment is this with respect to the application of Tinker. The thing that causes me to scratch my head in Tinker is if the student did exactly what the student did in this case, but her teammates reacted badly, if her teammates violated the rule of good sportsmanship, and if her teammates walked out of a practice or walked out of a performance in protest of what she did, there's now a Tinker disruption and her conduct can be disciplined even under the arguments of the opposing counsel. Counsel, it's your position, though, that suspension and expulsion would not be a permissible consequence of that speech. Is that right? Correct. But she could be excluded from the extracurricular activity. How do we draw that line? I mean, isn't the interest when we're looking at First Amendment its effect on showing speech? And I take it you don't dispute the notion that being kicked off of an extracurricular activity would have the effect of chilling speech of students. As we pointed out in our brief, the three part analysis for unconstitutional retaliation, we're only addressing the first part, not part two and part three. If we lose the first part, we agree that part two and part three of the retaliation context, we lose. Thank you very much. Thank you. Thank you to both counsel. We would ask if you could get together with the clerk's office and have a transcript prepared of today's oral argument. Thank you both for being here. Thank you for very well presented arguments. And we'll take the matter under advisement.